No. 19,206.

FRANK NICHOLSON, *Appellee*, v. THE ATCHISON, TO-
PEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

No. 19,472.

ANNIE M. NICHOLSON, as Administratrix, etc., *Ap-
pellee,* .v. THE ATCHISON, TOPEKA & SANTA FE RAIL-
WAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. RAILROAD—*In Process of Construction—Negligent Construc-
tion and Inspection—Sinking Road Bed—Assumption of Risk
by Employee.* Where a portion of a line of railroad in process
of construction has been completed, inspected, and passed, and
a speed of ten miles per hour over that portion has been au-
thorized, the conductor of a construction train, carrying ma-
terials to the site of track-laying operations and running at
the rate of four miles per hour, ·does not assume the risk of
injury from the sinking of an approach to a bridge in the
completed part of the road due to negligent construction and
inspection.

2. SAME—*Railroad Company Liable for Negligence of Construc-
tion Company.* The effect of certain evidence stated, and held
that the plaintiff was the servant of the defendant, who chose
to construct the new line through the instrumentality of a cor-
poration which it created, officered, and financed entirely within
itself.

Appeals from Reno district court; FRANK F. PRIGG,
judge.   Opinion filed April 10, 1915.   Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,*
and *Harlow Hurley,* all of Topeka, for the appellant.

*A. C. Malloy, George A. Neeley,* and *C. M. Williams,*
all of Hutchinson, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for per-
sonal injuries.   The plaintiff recovered and the defend-
ant appeals.

The defendant, desiring to construct a line of railroad running in a southwesterly direction from Dodge City, a division point on its main line, chose to accomplish its purpose through the medium of a corporation which it organized, officered, and financed entirely within itself. The roadbed was constructed by one firm of contractors and the track was laid by another. The rails were relay rails taken from other parts of the Santa Fe system, and train crews and train service were furnished to the contractors who laid the track. W. H. Durbin, an employee of the defendant on its eastern division, was appointed trainmaster and track inspector of the new line. Previous to June 11, 1912, some twenty-five miles of track had been laid. The track had been fully spiked and surfaced, had been inspected and passed by the track inspector to a point some distance beyond a bridge just west of a place called Ensign, and the track inspector had authorized a speed of ten miles per hour over this portion of the track. The plaintiff, who had been an employee of the defendant for a number of years, was assigned to a construction train on the new line, as conductor. No other engine having sufficient power being available, the defendant supplied a switch engine, with footboards at the front and rear, for use in operating the construction train. On the morning of June 11, 1912, the plaintiff left Ensign with his train, carrying construction materials, for the site of the construction work some miles beyond. The plaintiff, Durbin, and Joe Ault, who was boss tracklayer of the construction crew, were riding on the footboard of the engine. As they came near the bridge west of Ensign the plaintiff observed that Ault had a spike hammer in his hand and asked what he intended to do with it. Ault replied that he intended to spike down some bad track near a bridge. The plaintiff signaled the engineer to slow down, which the engineer did, when Ault said "This is not the bridge." The speed of the engine had been reduced to about four

miles per hour, and when it passed over the approach to the bridge the track sunk, the footboard caught on the bridge, was turned under and broken off, and the plaintiff was dragged a considerable distance before the engine stopped. He was badly bruised and mangled, and died in November, 1913, soon after the trial of the case was concluded. Revivor proceedings took such a course that two appeals were docketed in this court.

The ground of the action was negligence in the construction, inspection, and maintenance of the track at the place where the plaintiff was injured. The defense was that the plaintiff assumed the risk of injury at all times while engaged in construction work.

An effort was made to show that the plaintiff had equal opportunity with the defendant to know, and that he did know, the condition of the roadbed and track at the time and place of injury. These matters were determined adversely to the defendant by findings of fact returned by the jury. It was the plaintiff's business to deliver construction material by means of his train at places designated by those having authority over that subject. He was not engaged in constructing roadbed or in laying track. Contractors were employed for that purpose, and the plaintiff's duties consisted in moving his train over the track provided for him. The plaintiff freely admitted knowledge of conditions at the front, where his engine would frequently go off the track because rails were not spiked and surfacing was not done, but the engine never went off the track going to and from work, it did not rock particularly, the plaintiff noticed no depressions where the track had been surfaced, knew of no bad track where it had been surfaced, and did not notice any unevenness of the track at the place where the injury occurred when he passed over it returning from the front on the evening of June 10. The track had been inspected and had been passed by the official upon whose judgment he had the right to rely. It had taken on the character of

permanency and he had been authorized to run his train at more than double the rate of speed at which he was moving when the accident occurred. He did not observe any sinking of the track near the bridge at the time of the accident soon enough to avoid injury.

The result of the foregoing is that the defendant must rely upon the claim already indicated, that the plaintiff assumed the risk of injury at all points along the new line while construction work was in progress and until the line was open for general transportation purposes. Manifestly this claim is too broad.

It was the duty of the defendant to make even construction work at the very front as safe as work of that character can reasonably be made, and the plaintiff assumed only those hazards which inhered in construction work performed with reasonable care. As track laying progressed the same general standard of care applied to stretches of completed track left behind. The plaintiff might well assume the risk of using unsurfaced track only partially spiked, or even held simply by bridle bars, at the site of track-laying operations, but after track had been laid and safer conditions were practicable it was the duty of the defendant to establish them. Indeed, the defendant recognized and undertook to discharge this duty to persons who were obliged to go back and forth between material yards and the front. The inspector stated that it was his duty to see that the proper number of ties were used, that rails were properly spiked and plated, and that the track was properly lined and surfaced. Conceding the right of a master to conduct his business according to his own methods, within the limits of reasonable prudence already outlined, the inspector was stationed in the midst of the defendant's scheme of construction work and the plaintiff assumed those risks only which inhered in the operation of a construction train over inspected and accepted track while upon track of that kind. He assumed no risk of injury from defective con-

struction of which he was ignorant and which proper inspection would have disclosed or anticipated.

It appears that the track sunk at the end of the bridge because of rain which had fallen upon it. After the accident Durbin posted a bulletin to all conductors not to take trains out on the new line after heavy rains until advised by him to do so. The plaintiff was then in a hospital.

All the cases cited in the defendant's brief have been examined. Two of them disclose a system of railroad building which was in vogue in the state of Indiana twenty-five years ago. Under that system one-half the necessary number of ties were laid and the rails were spiked to them. Afterwards ties sufficient to complete the road were distributed, laid, and the rails spiked to them. After that the track was leveled and ballasted. All the while construction trains were obliged to go back and forth over the incomplete and insecure track, carrying ties, rails, spikes, ballast, and other construction materials. No more economic, efficient, and safe method was known. "Safety first" was not then a slogan and it was not perceived that peril to construction crews was unnecessarily and inexcusably prolonged. From such methods of railroad building originated declarations of the courts that employees engaged in construction work assumed the risk of injury until the road was completed and opened for the carrying of freight and passengers generally. The declarations have, on occasions, been repeated by the uncritical because found in the books, but they are misused when applied to scientific railroad building, as conducted by the defendant.

Other cases cited by the defendant deal with situations like that occupied by the plaintiff when operating his train at the site of track laying. Others deal with impermanent and shifting conditions constantly undergoing change by the very work which the servant is engaged in performing when injured. Others apply

the principle governing cases in which repair trains proceed into the midst of dangerous conditions for the purpose of remedying them.

The decision of the supreme court of Texas in the case of *Railway Company v. Redaker,* 67 Tex. 181, 2 S. W. 513, cited by the plaintiff, appears to be sound.

"The appellant complains that 'the court erred in that part of its charge wherein the jury were instructed that it was the duty of the defendant to furnish a safe road bed;' . . . Under this assignment it is submitted in substance that, because the evidence showed that appellee was employed as a brakeman on a construction train engaged in building an unfinished road, so much of the charge as instructed the jury that it was the duty of the company to furnish a safe road bed was calculated to mislead them. That there must of necessity be a time in the constructing of a railroad when its track is not perfectly safe, we think a proposition that does not admit of doubt. The employes operating a train at such time must be presumed to have assumed the additional risk incident to that state of affairs. But we can not assent to the doctrine that, when a portion of a road is completed and is being operated for construction purposes only, the company is not bound to use all reasonable care in putting it into such condition that its employes, engaged in running trains over it, may use it with safety to themselves and their co-employes.

"We see nothing in the circumstance that a road is not finished so as to be opened for the purposes of traffic to make this an exception to the general rule that the master must furnish the servant with safe machinery and appliances for the work he is called upon to perform. In this case the injury occurred on a side track. The road had been completed beyond this, and trains were being run past it for construction purposes; and in the absence of some proof showing a necessity for leaving the siding in an unfinished state, it must be held that it was the duty of appellant to put it in a condition to be operated in safety by its employes." (p. 187.)

The conclusion is that it was the defendant's duty to furnish the plaintiff a reasonably safe roadbed and track at the place where he was injured, the finding of

the jury that this duty was not fulfilled is sustained by the evidence, and the plaintiff did not assume the risk of injury at the place where he was injured.

The defendant made some contention at the trial that the plaintiff was not one of its employees when injured but was an employee of the Dodge City & Cimarron Valley Railway Company, which has been referred to as the company created by the defendant for the accomplishment of its purposes in building the Dodge City extension. It is not necessary to print the evidence bearing upon the matter. The branch company was a mere instrumentality of the Santa Fe company. To be more plain, the Dodge City & Cimarron Valley Railway Company was a ledger-heading in the Santa Fe Company's system of accounting, which did not break the relation of master and servant existing between the plaintiff and the defendant when the plaintiff was placed in charge of the construction train.

The judgment of the district court is affirmed.